UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:13-cv-148-FDW

| ZANE JOHNSON, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) | **ORDER** |
|  | ) |  |
| ROBERT C. LEWIS, Director of Prisons, et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

THIS MATTER comes before the Court on Defendant George Solomon's Motion for Summary Judgment, (Doc. No. 37).

I. **BACKGROUND**

A. **Procedural Background**

Pro se Plaintiff Zane Johnson, a North Carolina state inmate currently incarcerated at Lanesboro Correctional Institution ("Lanesboro"), filed this action on March 8, 2013, pursuant to 42 U.S.C. § 1983, and he filed an Amended Complaint on December 19, 2013.[1] In this action, Plaintiff contends that his rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") are being violated because he is not being fed a diet at Lanesboro that conforms to his religion—Hebrew Israelite.[2] On June 9, 2014, Defendants filed a

---

[1] On December 3, 2013, this Court entered an Order requiring Plaintiff to re-submit the Complaint because the Complaint in its current form was illegible. (Doc. No. 15).

[2] In his Amended Complaint, Plaintiff did not specifically cite the violations of law or name with specificity the legal claims he purports to bring against Defendants. See (Doc. No. 16). However, Plaintiff's original complaint stated (generally) that his rights, which are protected by

1

motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 27). On December 16, 2014, the Court granted, in part, and denied, in part, Defendants' Motion to Dismiss and allowed only Plaintiff's claim for injunctive relief against Defendant George Solomon to proceed in his official capacity. (Id.). Solomon is the Director of Prisons for the North Carolina Department of Public Safety. The Court dismissed all remaining claims and Defendants from the action. (Id.).

Defendant Solomon filed the pending summary judgment motion on November 23, 2015. (Doc. No. 37). On the same day, this Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court. (Doc. No. 40). On January 7, 2016, Defendant issued a revised memorandum in support of the summary judgment motion. In light of the revised memorandum, the Court entered a second Roseboro order. (Doc. No. 42). On January 28, 2016, Plaintiff filed a letter with the Court, which the Court will treat as his response to the summary judgment motion.

### B. Factual Background

#### 1. Plaintiff's Allegations

Because Plaintiff did not respond to the summary judgment with any evidence of his own, the Court has before it only the allegations made in Plaintiff's Amended Complaint to support his claims. Plaintiff's sets forth the following allegations in the Amended Complaint:

> My claim is that the Hebrew Israelites are [being fed from a] tray like [regular inmates] when the tray[s] are supposed to be order[ed] from a Kosher kitchen [due] to germs and no[t] getting the proper food like the five basic meats turkey,

---

the First Amendment and RLUIPA, are being violated.

2

> steak, chicken, baked fish. Now [Central Prison in Raleigh] is feeding right. Lanesboro plus Maury plus Scotland is feeding from a Kosher veggie menu and it [is] no[t] fair to lose … weight by being starved and forced of the diet due to the non-meat menu. I showed the court where Kosher meat vs. allow and [sic] temp tray is the kosher real way to feed Hebrew Israelite d[ue] to the menu from the Hebrew Israelite community Pub. [Raleigh] Dept. African Hebrew Israelite of Jerusalem P.O. Box 465 Dimona Israel 866000. I would love to honor my religion and the real forthcoming of the real food. They got people running off [from their] religion because of a veggie menu made up [by Raleigh] that in violate [sic]. Because the judge rule to serve Kosher but he thought it was going to be true Kosher not made up.

(Doc. No. 16 at 4). For relief, Plaintiff states that he wants to be paid $1000 a day "for the time I have suffered and order [Raleigh] to go to the non-air temporary tray so we can get the Kosher meat tray not hand-made with a bag that [sic] fruit, cheese, bread, juice Real to go with the trays of the truck." (Id.). Furthermore, in his response to the motion to dismiss, Plaintiff stated, "My reason for suing is to get the proper kosher diet which is the reg level one kosher and the sub for the non-meat and the vegan kosher for the vegan." (Doc. No. 30 at 1).

### 2. Defendant's Summary Judgment Materials

#### a. Background

To support the summary judgment motion, Defendant Solomon relies on all pleadings, exhibits, and other documents incorporated into the record. Defendant Solomon also relies on an affidavit submitted by Jackie Parker, Director of Correctional Food Services for the North Carolina Department of Public Safety ("NCDPS"). (Doc. No. 38 at ¶ 4: Parker Aff.). Parker has occupied that position since 2006 and is responsible for all food and nutrition services in North Carolina's adult correctional facilities, including managing the food and nutrition management budget and policies related to food and nutrition management. (Id. at ¶ 5). This includes policies relating to accommodating the inmates' religious diets. (Id.).

Parker states in her affidavit that, based on her education, training, and experience, to her

3

knowledge Kosher dietary laws disallow certain animals, fowl, and fish, most insects, and any shellfish or reptile. (Id. at ¶ 6). Additionally, Kosher species of meat and fowl must be slaughtered in a prescribed manner, and meat and dairy products may not be manufactured or consumed together. (Id.). There are no special requirements for preparing most fruits, vegetables, and bread products because these foods are considered "pareve," meaning they are neutral and contain neither meat nor dairy products. (Id.).

In June 2010, Parker met with Betty Brown, NCDPS' Director of Chaplaincy Services, and Rabbi Raachel Jurovics in an effort to ensure that the dietary options then provided inmates of the Orthodox, Reform, and Conservative Jewish faiths were religiously acceptable. (Id. at ¶ 7). At the meeting, Parker and Brown provided Jurovics with the dietary policies and menus from NCDPS' lacto-ovo-vegetarian or alternate diets and explained the sourcing, preparation, storage, and serving instructions for those diets. (Id.). Taking into consideration that NCDPS was serving incarcerated adherents of varying Jewish denominations, Rabbi Jurovics opined that the lacto-ovo-vegetarian diet was sufficiently compliant with Jewish dietary law and an acceptable alternative to a Kosher diet. (Id.). Thus, the Religious Practices Committee ("RPC") included the lacto-ovo-vegetarian diet as an alternative diet option for Judaism adherents. (Id. at ¶ 8). The lacto-ovo-vegetarian diet is a vegetarian diet that includes some dairy products and eggs, and pareve food. (Id. at ¶ 9).

In 2012, due to increased demand, NCDPS added provisions to the Religious Menu Accommodation policy to allow inmates of qualifying Jewish faith practices, including Hebrew Israelites, to begin receiving Kosher meals that were to be prepared within select NCDPS facilities. (Id. at ¶ 11). The new policy was undertaken as the result of inmate litigation, rising inmate demand, and the excessive cost of providing Kosher prepacked meals from Gleiberman's

4

Food Mart. See (Id. at ¶ 13; 14). Thus, NCDPS' election to take preparation of Kosher meals in-house was largely a cost-saving measure for the state and taxpayers of North Carolina. See (Id. at ¶ 14). During the process, a Kosher meal plan was written and analyzed by staff registered dietitians for nutritional adequacy. (Id.). NCDPS invested monies that had previously been spent on the prepacked meals into retro-fitting kitchens of certain facilities in order to prepare and provide Kosher meals and began ordering certain Kosher products in bulk, rather than in individually pre-packed meals. (Id.). Under the new policy, NCDPS built and presently maintains separate food preparation, cooking, and cleansing areas within certain existing prison unit kitchens dedicated solely to the preparation of Kosher meals ("Kosher kitchens"). (Id. at ¶¶ 14-16; Doc. No. 38 at pp. 11-12: NCDPS Food and Nutrition Management Policies and Procedures, Policy, § 800.8).

Kosher kitchens are equipped with necessary facilities to store, segregate, prepare, and serve Kosher food in accordance with Jewish dietary law. (Id. at pp. 13-15: Policy §§ 800.11, 800.12, 800.13 & 800.14). An inmate whose designated religion mandates a Kosher diet, including Hebrew Israelite inmates, may request to be placed on the Kosher meal plan. (Id. at ¶¶ 18-19; Id. at pp. 11-12: Policy §§ 800.7, 800.8). If the inmate is housed at a facility not capable of providing him Kosher meals, the inmate will be transferred to a facility with a Kosher kitchen and will be provided Kosher meals as soon as reasonably possible. (Id. at p. 12: Policy § 800.9).

Upon the inmate's arrival at the "new" facility, the inmate must again confirm that he would like to receive Kosher meals. (Id.). In advance of promulgation of the Religious Menu Accommodation policy, Rabbi Jurovics was again consulted regarding the construction, layout, and maintenance of the Kosher kitchens and the proposed Kosher diet. (Id. at ¶ 17). Rabbi Jurovics opined that the plan appeared thoughtfully designed and appropriate. (Id.). Rabbi

Jurovics made several suggestions to ensure that Kosher and non-Kosher foods, utensils, serving apparatus, trays, and plates would not be co-mingled, and NCDPS incorporated Jurovic's suggestions. See (Id.). Additionally, staff and inmates preparing Kosher meals have been trained in Kosher meal preparation and are provided with a copy of the policy on Kosher meal preparation. (Id. at ¶¶ 20; 21).

The facility where Plaintiff is housed, Lanesboro, was retro-fitted with a Kosher kitchen and prepares Kosher meals for inmates housed at that institution as well as to neighboring Brown Creek Correctional Institution. (Id. at ¶ 18). It is estimated that NCDPS has spent in excess of $400,000.00 to build and equip these new Kosher kitchens. (Doc. No. 41-1 at ¶ 17). Under the new policy, Kosher foods are selected and specially ordered for the Kosher facilities, where they are stored separately from regular food items in both refrigerated and dry storage in the facility kitchen. (Doc. No. 38 at ¶ 21). Again, for pareve foods, there are no special requirements for storage. (Id.). The Kosher kitchens are also equipped with color-coded trays and utensils, and those items are stored and washed separately from any non-Kosher trays and utensils. (Id. at ¶ 22). All Kosher trays, utensils, pots, and pans used in Kosher meal preparation are washed in a dedicated Kosher dishwashing sink (3 compartments), at 110 degrees in the first two sink compartments, and then sanitized at 171 degrees in the third compartment. (Id.).

After sanitization, the Kosher trays, utensils, pots, and pans are stored separately and do not come into contact with any non-Kosher items. (Id.). Additionally, Kosher meats and dairy are also not stored together, nor are they served together in Kosher meals. (Id. at ¶ 23). Parker asserts that she has personally visited the kitchen at Lanesboro and, based on her observations, has ensured that Lanesboro's Food Management staff members are following the Religious Menu Accommodation policy, including those provisions that apply to Kosher diets. (Id. at ¶¶

24-25). Further, Parker states that, based on her education, training, experience, and the information provided to her by those in the Jewish community, the Kosher meals prepared at NCDPS facilities and provided to inmates of the Jewish faith practices, including Hebrew Israelites, within NCDPS custody, including those at Lanesboro Correctional Institution, comply with Kosher dietary laws. (Id. at ¶ 26).

**II.     STANDARD OF REVIEW**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

7

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S. Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III.   DISCUSSION

As noted, Plaintiff alleges claims pursuant to both RLUIPA and the First Amendment. Beginning with plaintiff's RLUIPA claim, RLUIPA provides, in part: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." Cutter v. Wilkinson, 544 U.S. 709, 721 (2005). Under RLUIPA, the plaintiff bears the initial burden of showing that the challenged policy substantially burdens his exercise of his religion. See 42 U.S.C. § 2000cc-2(b); Holt v. Hobbs, 135 S. Ct. 853, 862 (2015). The statute defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); Smith v. Ozmint, 578 F.3d 246, 251 (4th Cir. 2009). A "'substantial burden' is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs, [] or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and

8

abandoning one of the precepts of her religion on the other hand." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (quotations, citation, and alterations omitted).

Once the inmate makes a prima facie showing, the burden shifts to the government to prove that "the burden in question is the least restrictive means of furthering a compelling governmental interest." Ozmint, 578 F.3d at 250. "'RLUIPA adopts a . . . strict scrutiny' standard." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012) (quoting and citing Lovelace, 472 F.3d at 198 n.8). Under RLUIPA, the court must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 544 U.S. at 723 (quotation omitted). "However, 'a court should not rubber stamp or mechanically accept the judgments of prison administrators.' . . . Rather, due deference will be afforded to those explanations that sufficiently 'take[] into account any institutional need to maintain good order, security, and discipline.'" Couch, 679 F.3d at 201 (quoting Lovelace, 472 F.3d at 190).

As for Plaintiff's First Amendment claim, the Free Exercise Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I. The Supreme Court has applied the First Amendment to the states through the Fourteenth Amendment. See Everson v. Bd. of Educ., 330 U.S. 1, 15 (1947). To state a free exercise claim under the First Amendment, a plaintiff must allege facts sufficient to show that he held a sincere religious belief, and that the official action or regulation substantially burdened his exercise of that belief. Hernandez v. Comm'r, 490 U.S. 680, 699 (1989). A prison policy that substantially burdens an inmate's ability to practice his religion withstands a First Amendment challenge when it is "reasonably related to legitimate penological interests."

O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). In deciding whether a defendant's actions can be sustained as reasonably related to legitimate penological interests, the court must consider the following four factors: (1) whether there is a valid, rational connection between the regulation and the legitimate penological interest; (2) whether there are alternative means of exercising the right in question that remain open to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the penological interest. See Turner, 482 U.S. at 89-90. Claims brought under the First Amendment are subject to a less demanding standard of proof than claims brought under RLUIPA, with RLUIPA claims requiring "strict scrutiny instead of reasonableness." See Lovelace, 472 F.3d at 199 n.8.

Here, Defendant has presented evidence on summary judgment showing that Plaintiff's rights are not being violated under either RLUIPA or the First Amendment. Defendant has presented undisputed evidence on summary judgment, through Jackie Parker's affidavit, showing that NCDPS has undertaken extensive measures to provide Kosher diets to inmates whose religious beliefs require such a diet. Parker's affidavit indicates that staff at Plaintiff's housing facility, Lanesboro, has been trained on the Kosher dietary policy and she has personally verified that they are adhering to the policy. (Doc. No. 38 at ¶¶ 19; 22). Parker explains the elaborate two-year process that resulted in the current policy and describes her interactions with a rabbinical authority (Rabbi Jurovics) in ensuring that the policy, in its current state, complies with Kosher dietary requirements. (Id. at ¶ 18).

Plaintiff does not state how Plaintiff's dissatisfaction with the Kosher menu amounts a deprivation of his religious rights or how the diet places a substantial burden on Plaintiff's ability

10

to practice his religion. Indeed, Plaintiff has plainly acknowledged that NCDPS offers him a Kosher diet option as a follower of the Hebrew Israelite faith. Plaintiff merely indicates that he would like to receive a diet to his satisfaction and states "I would love to honor my religion." Plaintiff has not stated, however what his religious beliefs are and what they require of him, or how the provided Kosher diet substantially burdens his ability to practice his religion. Assuming arguendo that Plaintiff's religious beliefs require him to adhere to a Kosher diet, Plaintiff's conclusory statements are insufficient to demonstrate that his ability to exercise his religious rights has been substantially burdened. Plaintiff, at no time, indicates that NCDPS' policies allowing him a Kosher diet have caused him to act in a manner violating his religious beliefs or prohibiting him from some form of worship as a Hebrew Israelite.[3] Rather, the undisputed facts of the case demonstrate that there is a suitable Kosher diet available to him. Thus, the Court finds that there is no merit to Plaintiff's claim that the Kosher diet he is being fed currently somehow places a substantial burden on Plaintiff's ability to exercise his religion in violation of

---

[3] Plaintiff appears to be dissatisfied with the Kosher diet that Hebrew Israelite inmates receive because it does not include meat products. See (Doc. No. 16 at 4). The Eastern District of North Carolina has upheld NCDPS' Kosher dietary policies and has rejected similar claims regarding Kosher diets from other dissatisfied inmates. For instance, the Eastern District of North Carolina recently rejected another inmate's similar challenge to the diet provided by NCDPS. See Hodges v. Brown, Civil Case No. 5:11-ct-03242-D, 2015 WL 736077, at *8 (E.D.N.C. Feb. 20, 2015) (stating that "defendants have not substantially burdened [Plaintiff's]s religious exercise concerning his diet in light of the lacto-ovo-vegetarian diet and the Religious Menu Accommodation policy," that "any burden defendants continue to place on [Plaintiff's] religious beliefs concerning his diet are justified by the state's compelling interest in avoiding excessive costs," and granting summary judgment to defendants on plaintiff's RLUIPA and First Amendment claims concerning a Kosher diet). See also Turner-Bey v. Maynard, Civil No. JFM-10-2816, 2012 WL 4327282, at *9 (D. Md. Sept. 18, 2012) (giving prisoner-plaintiff a lacto-ovo-vegetarian meal, which provided dairy products but no meat or fish in order to comport with Kosher diet requirements, did not violate the First Amendment or RLUIPA, where the prisoner plaintiff failed to produce evidence that eating ritually slaughtered meat was a tenet of his religion and not a purely secular concern).

RLUIPA.

The Court further finds that, even if Plaintiff could demonstrate a substantial burden, prisons have a compelling and legitimate governmental interest in the "orderly administration of a [food service] program" that accommodates "the religious dietary needs of thousands of prisoners." Resnick v. Adams, 348 F.3d 763, 769 (9th Cir. 2003). NCDPS had long offered the lacto-ovo-vegetarian alternative diet plan to other religious groups with similar dietary needs. NCDPS secured the opinion of an outside rabbinical consultant who opined that the lacto-ovo-vegetarian diet plan comported with Jewish dietary law, such that offering it to Jewish inmates, including Hebrew Israelites, fulfilled both their religious obligations and served the interests of the NCDPS. Here, NCDPS made every effort to afford Plaintiff a religiously compliant diet in first offering him the lacto-ovo-vegetarian diet and then by offering him a Kosher diet plan. As a result, Plaintiff has not demonstrated that NCDPS has substantially burdened his ability to practice his faith or, at the very least, that, if NCDPS placed some kind of burden upon Plaintiff's ability to practice his religion, NCPDS did not do so with a compelling governmental interest in preservation of state fiscal resources and in the least restrictive manner possible.

As noted, in response to the summary judgment motion, Plaintiff has come forward with no evidence that is admissible on summary judgment. Rather, he states only, in a letter in response to the summary judgment motion, that the diet he is being served is designed for the Jewish faith, which Plaintiff states is very different from the Hebrew Israelite faith. He also appears to be complaining vaguely that the State is not using the funds that were appropriated to make the prison diets conform to the diets of Hebrew Israelites. Plaintiff has simply not come forward with evidence on summary judgment raising a genuine dispute of material fact as to whether his rights are being violated under the First Amendment or RLUIPA.

In sum, for the reasons stated herein, Defendant is entitled to summary judgment.

## IV. CONCLUSION

Plaintiff has failed to raise a genuine issue of material fact as to whether his rights under the First Amendment and RLUIPA were violated, and Defendant is therefore entitled to summary judgment.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment, (Doc. No. 37), is **GRANTED**, and this action is dismissed with prejudice.

2. The Clerk is respectfully instructed to terminate this action.

Frank D. Whitney
Chief United States District Judge